(No. 51311.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant,
v. ELIJAH BAPTIST, Appellee.

*Opinion filed May 18, 1979.*

20

William J. Scott, Attorney General, of Springfield, and Bernard Carey, State's Attorney, of Chicago (Donald B. Mackay and Melbourne A. Noel, Jr., Assistant Attorneys General, and Marcia B. Orr, Thomas V. Gainer, Jr., and Lee T. Hettinger, Assistant State's Attorneys, of counsel), for the People.

James J. Doherty, Public Defender, of Chicago (Robert T. Badesch and Ronald P. Alwin, Assistant Public Defenders, of counsel), for appellee.

MR. JUSTICE MORAN delivered the opinion of the court:

Following a jury verdict of guilty, defendant was convicted, in the circuit court of Cook County, of the offenses of murder and attempted armed robbery in connection with the shooting death of Sam Blue. He was

sentenced to 60 to 80 years in the penitentiary. The appellate court reversed (63 Ill. App. 3d 953), and we granted the State leave to appeal.

The State contests both of the appellate court's alternative grounds for reversal of defendant's conviction, which were: (1) the trial court erred in allowing testimony of a prosecution witness regarding the contents of a letter which had not been received in evidence; and (2) the opening statement of the prosecutor resulted in substantial prejudice to the defendant.

At approximately midnight on the night of July 28, 1974, Sam Blue died of a bullet wound in the chest while outside his grocery store on the corner of 60th Place and Halsted Street in Chicago. A somewhat detailed review of the testimony is necessary.

For the State, Leo Carter testified as follows. On the evening of July 28, 1974, between 11:30 p.m. and midnight, Carter was standing on a basketball court across the street from Blue's grocery. Defendant, whom Carter had known for over a year, stood nearby talking to two others. Blue was standing outside his store talking to a woman. When the woman left, defendant and his two companions crossed the street and approached Blue. Carter saw the defendant grab Blue around the neck and put his hand up to Blue's head, but could not determine whether defendant had a gun in his hand. Defendant and Blue wrestled briefly, and a gun was fired. The two individuals who had been with defendant ran down Halsted Street, while defendant ran in another direction. Blue began to chase and shoot at the defendant but, after firing three or four shots, fell near the side of his store.

Subsequent to the shooting, Carter testified he and Leslie Scott, also an eyewitness, went to Carter's house and then to a local lounge. There they again saw defendant, who had since removed his shirt. While at the lounge, Carter learned that Blue had died. After a short

while, Carter and Scott left the lounge and were thereafter stopped by the police. At that time, Carter, because he did not want to get involved, told the police that he knew nothing about the shooting of Blue. Upon being taken to the hospital, however, and being shown Blue's body, he told the police that defendant, while in the company of two others, had shot Blue. Later at the police station, Carter gave the police a written statement to that effect. The police presented a group of photographs to Carter, who identified defendant out of this group as the man who shot Blue. Carter again identified the photo at trial, and made an in-court identification of the defendant.

Carter stated that, on September 23, 1974, both he and Scott testified at defendant's preliminary hearing in connection with the Blue shooting.

Over defendant's objection made in a motion *in limine* on the first day of trial, Carter testified to an occurrence on June 14, 1975. On that date, at approximately midnight, Carter was with his brother Henry and Leslie Scott behind a building in the 600 block of West 60th Place. Defendant's brother, Michael Baptist, and three others, Wayne Lindsey, Lenox Lawrence and John Perkins, forced Scott and the two Carter brothers to stand against the wall of the building. Lindsey drew a gun and shot Leo Carter in the head and back. Leo's brother Henry and Leslie Scott were similarly shot. Leo survived, but Henry and Scott died as a result of the shootings.

Leslie Scott's preliminary hearing testimony was introduced by the State, and reads as follows. While standing in the vicinity of 60th Place and Halsted on the night of the Blue shooting, Scott was approached and asked by defendant if he wanted to assist defendant in a robbery. Defendant displayed a handgun during this conversation. Scott declined and walked away from defendant toward a vacant lot about 50 feet from where Blue was standing. Scott stated that, although it was dark,

there were street lights on the corner and, when he looked back, Scott saw defendant and the two others approach Blue. It appeared to Scott that defendant put the gun to Blue's head. Scott heard three shots, saw Blue start to run after defendant, and then saw Blue fall.

Annie Carter, Leo's sister, also testified at trial for the State. She had known the defendant and his brother Michael for two or three years. Over defendant's objection, Annie stated that, in late August of 1974, the month following the Blue shooting, she received a letter that had been mailed to her. The return bore defendant's name and address at the Cook County jail. The letter was signed at the bottom with the name "Eli," the name by which Annie knew the defendant. It stated that he liked Annie and her family but that, if Leo testified against him, he would have his brother and cousin do something to her family. Annie stated further that she did not show the letter to the police prior to Leo's shooting because she did not know that anything was going to happen to her brother and that, after her brother was shot, she did not show the letter to police because she was afraid. It was only one day prior to trial that Annie told the prosecution about the letter. We note that the record indicates the letter was made known to the court during defendant's motion *in limine,* referred to earlier. Annie testified that she could not produce the letter because it was engulfed in a fire that destroyed her house about two weeks earlier.

Investigator Kentalla of the Chicago Police Department testified that at approximately 1 a.m., on July 29, 1974, he was assigned to investigate a homicide in the vicinity of 60th Place and Halsted. He testified that, at the corner location of Blue's grocery store, he found a small pool of blood on the sidewalk alongside of the building. The investigator also stated that he displayed to Leo Carter the photographs from which Leo had identified the defendant and otherwise fully corroborated Leo's testi-

mony regarding Leo's identification of the photograph of defendant.

The final witness for the State, Investigator Herman of the Chicago Police Department, testified as to the June 14, 1975, shootings of Leslie Scott and the Carter brothers. He stated that he discovered the bodies identified as Henry Carter and Leslie Scott, then went to the hospital and talked to Leo Carter. Michael Baptist, Wayne Lindsey, Lenox Lawrence and John Perkins were subsequently arrested for these shootings.

Carl Dawson, a correctional officer at the Cook County jail, was called as a defense witness. Dawson testified that on July 28, 1974, he had worked the evening shift, and, upon leaving work at about midnight, drove his automobile toward his destination at 71st Street and Halsted. En route, traveling at approximately 25 miles per hour, he passed the intersection of 60th Place and Halsted. He observed a man standing against a wall, his hands in the air, and three men facing him, then saw three flashes from a gun and heard the shots. After traveling a short distance, Dawson made a U-turn and returned to the scene. He saw three individuals run in the same direction on 60th Place and into an alley. He searched for and located a police car nearby, told the two officers in the car about the shooting, and then proceeded to his destination. Shortly thereafter, he returned to the scene and gave a statement to a police officer in which he said he had seen three men shoot another man and run away. He testified to having described the three assailants as being a little shorter than the victim and dark complected.

Other than calling the police station a few days later to learn what happened to the victim, Dawson had no further contact with the police. His next contact with authorities occurred a year or more after the shooting, when he was first contacted by the public defender who represented the defendant.

Asked at trial whether defendant was one of the three Blue assailants, Dawson stated that, to the best of his knowledge, he was not; that defendant was "too tall and too light."

The other witness called by the defense was Sergeant Heard of the Chicago Police Department, who testified and confirmed that Dawson was present at the scene. He stated that, in filling out a police report on the Blue shooting, he talked to Dawson. While referring to the report, the sergeant testified that Dawson had indicated that the height of the three assailants averaged somewhere between five feet and five feet nine inches.

The State contends that the trial court properly admitted into evidence Annie Carter's testimony as to the contents of the letter she allegedly received from the defendant. Although its opinion does not so state, it is evident that the appellate court's ruling regarding the letter was based on the so-called "best evidence" rule. The appellate court held that Annie's explanation that the letter had been destroyed was insufficient to serve as a basis for allowing her to testify to the letter's contents. To introduce secondary evidence of the letter, it was incumbent upon the State to prove the prior existence of the original and also its unavailability. (*Gillson v. Gulf, Mobile & Ohio R.R. Co.* (1969), 42 Ill. 2d 193, 199.) Here, the State presented the testimony of Annie Carter, the purported recipient and custodian of the letter, who stated approximately when she received it, described the return name and address, and described the signature. She further testified to the reason for the letter's unavailability, namely, its destruction by fire. Defense counsel offered nothing on cross-examination or rebuttal to contravene Annie's testimony, nor did he suggest to the trial court what more, if anything, should have been required by the State. When a party seeks to introduce secondary evidence of a writing, the sufficiency of the evidence showing that it

is not within the offering party's power to produce the original depends upon the circumstances of each case and is, to some degree, within the discretion of the trial court. (*Maxcy-Barton Organ Co. v. Glen Building Co.* (1934), 355 Ill. 228, 238.) In our opinion, under the circumstances of this case a sufficient foundation was laid to permit the introduction of parol evidence of the contents of the letter. See generally *People v. Carter* (1968), 39 Ill. 2d 31, 36-37 (sufficient foundation was laid for the introduction of a multilith copy of defendant's typed confession where the prosecution stated that the original was destroyed after copies had been made because an original does not hold up very long); *Felix v. Caldwell* (1908), 235 Ill. 159; *Forsyth v. Vehmeyer* (1898), 176 Ill. 359, 361-63, *aff'd* (1900), 177 U.S. 177, 44 L. Ed. 723, 20 S. Ct. 623 (parol evidence of the contents of court records allowed where the records were destroyed by fire).

Before considering the appellate court's alternative ground for reversal of defendant's conviction, we address defendant's other argument that relates to the testimony regarding the letter. Defendant argues that the trial judge erred in allowing the prosecution to introduce evidence of the shootings of Leslie Scott and the Carter brothers. It is true that, as a general rule, evidence of other crimes committed by defendant, independent of the crime for which he is being tried, is inadmissible. (*People v. Tranowski* (1960), 20 Ill. 2d 11, 16, *cert. denied* (1960), 364 U.S. 923, 5 L. Ed. 2d 262, 81 S. Ct. 290, *cert. denied* (1962), 368 U.S. 978, 7 L. Ed. 2d 440, 82 S. Ct. 484; *People v. Lehman* (1955), 5 Ill. 2d 337, 342.) If relevant, however, for any purpose other than to show propensity to commit a crime, evidence of other crimes is admissible. (*People v. McDonald* (1975), 62 Ill. 2d 448, 455.) Evidence that defendant attempted to kill eyewitnesses to the Blue shooting is relevant and therefore admissible, in that it shows a consciousness of guilt. (*People v. Spaudling*

(1923), 309 Ill. 292, 302-06. See also *People v. Fiorito* (1952), 413 Ill. 123, 131.) Thus, if the June 14, 1975, shootings of Leslie Scott and the Carter brothers can be connected to defendant, evidence of these shootings is admissible. The evidence of defendant's letter to Annie following his arrest and prior to the preliminary hearing, threatening to have his brother and cousin harm the Carter family if Leo testified, was evidence establishing this connection. Consequently, the trial court properly allowed evidence of the subsequent shootings to go to the jury. It must be remembered that, inasmuch as defendant was not on trial for these shootings, the State need not establish this connection beyond a reasonable doubt. (*People v. Spaulding* (1923), 309 Ill. 292, 303.) Defendant's reliance on *People v. Hairston* (1970), 46 Ill. 2d 348, *cert. denied* (1971), 402 U.S. 972, 29 L. Ed. 2d 136, 91 S. Ct. 1658, which involved the sufficiency of evidence to support a conviction for solicitation of murder and attempted murder, is therefore misplaced.

We turn now to the appellate court's alternative ground for reversal: that the prosecutor's opening statement resulted in substantial prejudice to the defendant.

In his opening statement, the prosecutor made the following remark:

> "I further expect and submit to you that you will be shown that Carl Dawson, the Defense Witness, is a liar and is guilty of indictable perjury."

Immediately following the remark, the trial court sustained defendant's objection, ordered the remark stricken, and instructed the jury to disregard it. We deem such comment on a witness to be highly improper. Furthermore, we are cognizant of the growing concern over improper prosecutorial arguments. (See, *e.g., United States v. Spain* (7th Cir. 1976), 536 F.2d 170, 174-76, *cert. denied* (1976), 429 U.S. 833, 50 L. Ed. 2d 97, 97 S. Ct. 96; Singer, *Forensic Misconduct by Federal Prosecutors—*

*And How it Grew,* 20 Ala. L. Rev. 227 (1968).)
Nevertheless, improper remarks generally do not constitute
reversible error unless they result in substantial prejudice
to the accused. (*People v. Nilsson* (1970), 44 Ill. 2d 244,
248, *cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 2d 296,
90 S. Ct. 1881; *People v. Naujokas* (1962), 25 Ill. 2d 32,
38; *People v. Sicks* (1921), 299 Ill. 282, 285-86.) "Each
case of this kind must be decided upon its own facts."
*People v. Weathers* (1975), 62 Ill. 2d 114, 120.

We hold that, while the prosecutor's remark was in
error, it did not constitute reversible error in this case.
Evidence of defendant's guilt was overwhelming. The only
issue was one of identification. Two eyewitnesses, Leo
Carter and Leslie Scott, both testified positively that
defendant was the person who shot Blue. Their testimony
was consistent and unimpeached. The evidence linking
defendant with the subsequent shootings of these two
eyewitnesses following their testimony at defendant's
preliminary hearing further establishes defendant's guilt.
We do not rely, however, solely on this positive evidence
of guilt. Carl Dawson's testimony also must be considered.
He testified that, to the best of his knowledge, defendant
was not one of the three assailants. On cross-examination,
however, Dawson admitted that as he passed through the
intersection at the time of the shooting he was able to get
a mere glance at what was taking place. He admitted that
at no time (neither when he first went by nor when he
returned to the scene) did he get a look at any face.
Dawson's testimony was further impeached in several
other important respects with statements he gave to
defendant's attorney and with statements he gave to the
prosecution just one week prior to trial. After reviewing
Dawson's testimony and the record *in toto,* we are
convinced that, even absent the prosecutor's improper
remark, no reasonable jury would have given credence to
Dawson's opinion that defendant was not one of Blue's

assailants. We conclude, therefore, that the prosecutor's remark did not prejudice defendant to the point of constituting reversible error.

Additionally, although the prejudicial effect of an improper argument cannot always be erased from the minds of the jurors by an admonishment from the court (*People v. Garreau* (1963), 27 Ill. 2d 388, 391), the act of promptly sustaining the objection and instructing the jury to disregard such argument has usually been viewed as sufficient to cure any prejudice. See *People v. Hampton* (1969), 44 Ill. 2d 41, 45-46; *People v. Daugherty* (1969), 43 Ill. 2d 251, 255-56; *People v. Underhill* (1967), 38 Ill. 2d 245, 252-53, *cert. denied* (1968), 391 U.S. 912, 20 L. Ed. 2d 651, 88 S. Ct. 1803; *United States ex rel. Clark v. Fike* (7th Cir. 1976), 538 F.2d 750, 759, *cert. denied* (1977), 429 U.S. 1064, 50 L. Ed. 2d 781, 97 S. Ct. 791; Vess, *Walking a Tightrope: A Survey of Limitations on the Prosecutor's Closing Argument,* 64 J. Crim. L. & Criminology 22, 53-54 (1973).

In connection with his argument that the trial court erred in permitting the introduction of evidence of the subsequent shootings, the defendant argues that he was prejudiced by the repeated mention of these shootings during opening statement and closing argument. After reviewing the complained-of statements, we hold that all of them were either within the range of permissible comment on the evidence or the subject of objections which were sustained.

For the foregoing reasons, we reverse the judgment of the appellate court. In view of the appellate court's disposition of the case, the cause is remanded to that court with directions to decide any remaining issues raised there by defendant.

*Reversed and remanded,*
*with directions.*