MAGNA TRUST COMPANY, Adm'r of the Estate of James C. Jones, Deceased, Plaintiff-Appellee, v. ILLINOIS CENTRAL RAILROAD COMPANY, Defendant-Appellant.

Fifth District   No. 5—98—0792

Opinion filed April 18, 2000.

CHAPMAN, J., dissenting.

Kurt E. Reitz and Ann C. Barron, both of Thompson Coburn L.L.P., of Belleville, and Jonathan Freed, of Bradley & Freed, P.S.C., of Paducah, Kentucky, for appellant.

David V. Dorris, of Jerome Mirza & Associates, Ltd., of Bloomington, and William L. Broom III and Patricia A. Small, both of Barrett, Twomey, Morris, Broom & Hughes, of Carbondale, for appellee.

JUSTICE MAAG delivered the opinion of the court:

Plaintiff, Magna Trust Company, administrator for the estate of James (Rusty) C. Jones, filed a wrongful death complaint against defendant, Illinois Central Railroad Co. (Illinois Central), alleging a violation of the Safety Appliance Act (Act) (49 U.S.C. § 20301 *et seq.*

(1994)). Rusty Jones, an employee of Archer Daniels Midland (ADM), suffered fatal injuries when he was crushed between two railcars while attempting to adjust a coupler on one of the cars on November 23, 1994. The railcars were owned by Illinois Central. In the complaint, plaintiff alleged that Illinois Central violated the Safety Appliance Act by allowing one of its freight cars to be used in interstate commerce even though the coupler was missing a coupling pin and that this violation was a proximate cause of Rusty Jones's death. The jury returned a verdict in favor of plaintiff and awarded $1.8 million in damages. Illinois Central has raised several issues on appeal. Because a number of the issues turn on the nature of the case, we begin with that issue.

## I. THE NATURE OF THE CAUSE OF ACTION

### A. Nonrailroad Employees and the Safety Appliance Act

Illinois Central argues that plaintiff cannot maintain an independent cause of action under state law premised solely on a violation of the Safety Appliance Act. In support of its argument, Illinois Central states that the Safety Appliance Act itself provides no independent federal cause of action, and it cites *Crane v. Cedar Rapids & Iowa City Ry. Co.*, 395 U.S. 164, 23 L. Ed. 2d 176, 89 S. Ct. 1706 (1969), and then refers us to decisions from courts outside of Illinois that hold that a nonemployee cannot base a state-law claim solely on an alleged violation of the Safety Appliance Act. See *Keizor v. Sand Springs Ry. Co.*, 861 P.2d 326 (Okla. App. 1993); *Moses v. Union Pacific R.R.*, 64 F.3d 413 (8th Cir. 1995). Illinois Central urges us to follow the *Keizor* decision and to find that the establishment of an independent cause of action and the imposition of absolute liability for a violation of the Safety Appliance Act is improper as a matter of law. Because this issue involves a question of law, our standard of review is *de novo*. See *Athens v. Harris Trust & Savings Bank*, 297 Ill. App. 3d 1055, 1060, 697 N.E.2d 909, 913 (1998).

■ The Safety Appliance Act does not create a cause of action for either railroad employees or nonemployees who are injured as a result of a railroad's violation of the Act. See *Crane*, 395 U.S. 164, 23 L. Ed. 2d 176, 89 S. Ct. 1706. But Congress did provide a federal cause of action for railroad employees in the Federal Employers' Liability Act (FELA) (45 U.S.C. § 51 *et seq.* (1988)). The FELA "embraces claims of an employee based on violations of the Safety Appliance Act." *Crane*, 395 U.S. at 166, 23 L. Ed. 2d at 179, 89 S. Ct. at 1708. Because the FELA is available only to railroad employees, nonemployees who are injured as a result of violations of the Safety Appliance Act must look to a common law action in tort and file a state cause of action. See *Crane*, 395 U.S. at 166, 23 L. Ed. 2d at 180, 89 S. Ct. at 1708.

Therefore, we must look to our own state's common law to determine whether a plaintiff may file a cause of action based upon a violation of the Safety Appliance Act. The Illinois Supreme Court faced this issue in a case where a railroad passenger, injured when a coupler broke, brought an action in circuit court and alleged that the defendant railroad had violated the Safety Appliance Act and was absolutely liable for his injuries. See *Boyer v. Atchison, Topeka & Santa Fe Ry. Co.*, 38 Ill. 2d 31, 230 N.E.2d 173 (1967). After reviewing interpretations given to the Act in numerous federal decisions, our supreme court concluded: "The Federal Safety Appliance Act is as much a part of the law and policy of the States as are their own laws enacted by the State legislatures." *Boyer*, 38 Ill. 2d at 36, 230 N.E.2d at 177. In *Boyer*, the court held, "[I]t is apparent that a breach of the Safety Appliance Act does give rise to a civil cause of action which is separate from any cause of action based on negligence and that absolute liability for such breach is imposed on the violator." *Boyer*, 38 Ill. 2d at 35-36, 230 N.E.2d at 176. To base a cause of action on a breach of the Safety Appliance Act, it must appear that the plaintiff was within the class of persons the statute was intended to protect and that the injury was the type of risk covered. See *Boyer*, 38 Ill. 2d at 37, 230 N.E.2d at 177.

In its argument, Illinois Central urges us to follow the holding in *Keizor v. Sand Spring Ry. Co.*, 861 P.2d 326 (Okla. App. 1993). There, the Oklahoma Court of Appeals, citing the *Crane* decision, stated that since the Safety Appliance Act creates neither an express nor an implied cause of action for nonemployees, a nonemployee's action lies, if at all, in a common law action in negligence. *Keizor*, 861 P.2d at 330.

After reviewing the *Keizor* decision, we decline to follow it. Though the *Keizor* court dutifully recited the rules announced in *Crane*, it proceeded to ignore those rules in its analysis. The *Keizor* court correctly cited *Crane* for the proposition that any action for a violation of the Safety Appliance Act resulting in injury to a nonemployee must arise under the common law and the injured party "must look to *state law* \*\*\* for remedy." (Emphasis added.) *Keizor*, 861 P.2d at 329. Then, in a leap of legal logic, unsupported by authority or explanation, the *Keizor* court said that because the United States Supreme Court, in the 1969 *Crane* decision, highlighted the absence of a *federal* cause of action under the Safety Appliance Act for nonemployees and because Congress, in its 1988 amendments to the Safety Appliance Act, remained absolutely silent about creating any private causes of action in anyone except railroad employees, "it is clear \*\*\* that Congress intended to deny private causes of action to non[ ]employees of the railroad." *Keizor*, 861 P.2d at 330. Why? Under what rule of statutory

construction? Without any discussion of this matter, the *Keizor* court concluded in that single clause that it could derive and declare the intentions of Congress. The statement is mere conjecture (or perhaps a statement of desire) and is devoid of legal support.

We respectfully disagree with the conclusion of our colleagues on the Oklahoma Court of Appeals. Upon our review of the 1988 amendments to the Safety Appliance Act, we found no substantive changes to provisions of the Safety Appliance Act that are relevant to this discussion. In 1994, Congress revised and codified the subject matter covered by the Safety Appliance Act (formerly 45 U.S.C. § 1 *et seq.* (1988)) into Title 49, Transportation (49 U.S.C. § 20101 *et seq.* (1994)). The legislative history states that this was a codification bill, enacting revisions without making changes in substance or impairing the precedent of earlier judicial decisions. H.R. Rep. No. 103—180 (1993), *reprinted in* 1994 U.S.C.C.A.N. 818, 822 ("[T]his bill makes no substantive change in the law. It is sometimes feared that mere changes in terminology and style will result in changes in substance or impair the precedent value of earlier judicial decisions and other interpretations. *** In a codification law, however, the court upholds the contrary presumption: the law is intended to remain substantively unchanged").

■ Although Congress certainly could have, it declined to make substantive amendments. Since Congress is presumed to know the judicial interpretation given a statute, this decision by Congress evidences an intent to maintain the interpretation given by the United States Supreme Court in *Crane.* See generally *Lorillard v. Pons*, 434 U.S. 575, 55 L. Ed. 2d 40, 98 S. Ct. 866 (1978); *People v. Agnew*, 105 Ill. 2d 275, 279-80, 473 N.E.2d 1319, 1322 (1985). This is a principle of statutory construction, referred to as "legislative acquiescence" in some jurisdictions and "legislative reenactment" in others. Considering this principle of statutory construction together with the legislative history, it is clear that the *Crane* interpretation stands as the correct statement of law. Thus, railroad employees have a cause of action premised on violations of the Safety Appliance Act, pursuant to FELA, and nonrailroad employees have a cause of action premised on violations of the Safety Appliance Act under a state's common law. See *Crane*, 395 U.S. at 166, 23 L. Ed. 2d at 179-80, 89 S. Ct. at 1708; *Boyer*, 38 Ill. 2d at 36, 230 N.E.2d at 177.

Illinois Central's reliance on *Moses v. Union Pacific R.R.*, 64 F.3d 413 (8th Cir. 1995), is misplaced. In *Moses*, the Eighth Circuit Court of Appeals held that in a state common law tort action, a violation of the federal Safety Appliance Act may be offered as evidence of negligence. *Moses*, 64 F.3d at 417. We note that the eighth circuit was applying the state law of Kansas, and its holding must be considered in that context.

States differ in their approaches to the breach of a criminal or safety statute. In some states, the breach constitutes "negligence per se." In others, it is "evidence of negligence" or "*prima facie* evidence of negligence." *O'Donnell v. Elgin, Joliet & Eastern Ry. Co.*, 338 U.S. 384, 390, 94 L. Ed. 187, 192, 70 S. Ct. 200, 204 (1949). Further confusion arises because judicial interpretation of these phrases varies from state to state. In *Moses*, the eighth circuit simply applied the rule set forth in *Crane* and required a nonemployee to "look for his remedy to a common-law action in tort" under state law. *Crane*, 395 U.S. at 166, 23 L. Ed. 2d at 180, 89 S. Ct. at 1708. We have no quarrel with the application of Kansas law under the facts of that case. But borrowing a line from Dorothy in the Wizard of Oz, "We're not in Kansas anymore," we consider and apply the law of the State of Illinois.

■ In Illinois, a violation of a statute or ordinance designed to protect human life is *prima facie* evidence of negligence. See *Kalata v. Anheuser-Busch Cos.*, 144 Ill. 2d 425, 434, 581 N.E.2d 656, 661 (1991). Since the violation is only *prima facie* evidence of negligence, a defendant may prevail by showing that he acted reasonably under the circumstances. A violation of a safety statute does not constitute negligence *per se*, *i.e.*, strict liability, unless the legislature clearly intends to impose strict liability. See *Abbasi v. Paraskevoulakos*, 187 Ill. 2d 386, 395, 718 N.E.2d 181, 185 (1999). Strict liability prevents a defendant who has violated the Act from avoiding liability by showing that he exercised due care under the circumstances. It places the entire responsibility for injury upon the defendant who violates the Act. See *Barthel v. Illinois Central Gulf R.R. Co.*, 74 Ill. 2d 213, 220-21, 384 N.E.2d 323, 327 (1978). Strict liability statutes are purposefully enacted to protect a certain class of persons against their own inability to protect themselves. See Restatement (Second) of Torts § 483, Comment *c* (1965). For example, Illinois courts have found the legislative intent to impose strict liability in the Child Labor Law (820 ILCS 205/1 *et seq.* (West 1992)) and the now-repealed Structural Work Act (740 ILCS 150/1 *et seq.* (West 1992)).

■ In 1893, Congress made it unlawful for a railroad company to use any car that is not equipped with properly functioning automatic couplers. In enacting the Safety Appliance Act, Congress intended to secure the safe operation of interstate trains by imposing an absolute duty on railroads to equip and maintain their cars with secure and efficient couplers. See *Boyer*, 38 Ill. 2d at 38, 230 N.E.2d at 178. Determining that Congress intended to impose absolute liability for a violation of the Act, the United States Supreme Court "swept all issues of negligence out of cases under the Safety Appliance Act." *O'Donnell*, 338 U.S. at 390, 94 L. Ed. at 192, 70 S. Ct. at 204. The

Court declared that a violation of the Act is itself an actionable wrong and is in no way dependent upon negligence. The duty is absolute and the railroad is not excused by showing proof of due care. See *O'Donnell*, 338 U.S. at 390, 94 L. Ed. at 192, 70 S. Ct. at 204.

We have no doubt that Congress intended to impose an extraordinary obligation on the railroad for the purpose of protecting a certain class of persons against their own inability to protect themselves from the risks posed by malfunctioning safety appliances. Therefore, Illinois courts will impose absolute liability for a violation that causes injury to a member of that protected class. See *Boyer*, 38 Ill. 2d at 36-37, 230 N.E.2d at 176-77. A nonrailroad employee may bring an independent cause of action when a defendant's violation of the Act causes injury. See *Jenkins v. Chicago & Eastern Illinois R.R. Co.*, 5 Ill. App. 3d 954, 960, 284 N.E.2d 392, 397 (1972). In order to present a submissible case, the plaintiff must present evidence showing that the injury was caused by a failure of the equipment to operate in accordance with the requirements of the Act, *i.e.*, that the equipment failed to function at the time in question, and that there was a causal connection between the equipment failure and the plaintiff's injury. See *Jenkins*, 5 Ill. App. 3d at 960, 284 N.E.2d at 397. With that background, we can readily dispose of several related issues raised by Illinois Central.

## B. The Scope of the Protected Class

Illinois Central argues that Rusty Jones was not within the class of persons protected by the Safety Appliance Act. Illinois Central contends that because Rusty Jones was not an employee of Illinois Central, because it did not control the manner or method of his work, and because its cars and railroad tracks were within the control of ADM and on ADM property, Rusty Jones cannot be considered a member of the special class that the Act protects.

■ The general purpose of the rail safety programs is to promote safety in every area of railroad operations and to reduce railroad-related accidents and incidents. See 49 U.S.C. § 20101 (1994). The Safety Appliance Act, fairly interpreted, "must be held to protect all who need protection from dangerous results due to maintenance or operation of congressionally prohibited defective appliances." *Coray v. Southern Pacific Co.*, 335 U.S. 520, 522-23, 93 L. Ed. 208, 210, 69 S. Ct. 275, 276 (1949). Illinois courts have held that both passengers (*Boyer*, 38 Ill. 2d at 37, 230 N.E.2d at 177) and nonemployees (*Jenkins*, 5 Ill. App. 3d at 965, 284 N.E.2d at 401) fall within the scope of its protections.

In this case, plaintiff alleged that Rusty Jones, an ADM employee, was crushed between two railcars while adjusting a coupler that was

not functioning properly. The Act requires that rail carriers use railcars equipped with couplers, capable of being coupled and uncoupled "without the necessity of individuals going between" the cars. 49 U.S.C. § 20302(a)(1)(A) (1994). The express purpose of the Act is to place an absolute duty upon the railroad to equip and maintain automatic couplers on its cars in order to protect persons from the risks of working between cars in coupling operations. Given that express purpose, we can conceive of no reason to protect a railroad employee but to ignore a nonemployee, such as Rusty Jones, who is injured as a result of exposure to the same risks. See *Boyer*, 38 Ill. 2d at 37, 230 N.E.2d at 177; see *Shields v. Atlantic Coast Line R.R. Co.*, 350 U.S. 318, 100 L. Ed. 364, 76 S. Ct. 386 (1956). The only difference is whether the injured party seeks his remedy for a violation under the FELA or under a state's common law in tort. See *Crane*, 395 U.S. at 166, 23 L. Ed. 2d at 179-80, 89 S. Ct. at 1708.

Illinois Central also contends that Rusty Jones was not a member of the protected class to which it owed a duty because Illinois Central did not control the manner or method of his work and because its cars and tracks were within the control of ADM and on ADM property.

■ A railroad is liable for injuries resulting from violation of the Act if the equipment causing injury is in use on its line at the time of the injury. See *Barney v. Staten Island Rapid Transit Ry. Co.*, 316 F.2d 38, 41-42 (3d Cir. 1963). "Federal cases have repeatedly held that a car is in use on a railroad's line, for purposes of the statute, when it has been delivered to a user on its own track for loading and unloading, particularly when that user is not a railroad and neither maintains nor operates railroad equipment." *Jenkins*, 5 Ill. App. 3d at 963, 284 N.E.2d at 399 (and cases cited therein).

Our colleagues in the first district addressed this issue in a case factually similar to the case at bar. *Jenkins v. Chicago & Eastern Illinois R.R. Co.*, 5 Ill. App. 3d 954, 963, 284 N.E.2d 392, 399 (1972). In *Jenkins*, a Flintkote employee was injured while moving a boxcar on the spur track in the freight yard owned by his employer. There, the railroad delivered box cars to the spur track on Flintkote's freight yard. Flintkote workers then loaded and unloaded the box cars. As part of the loading process, Flintkote's workers had to move the boxcars to and from the loading docks. The workers moved the boxcars on the spur track with a "car mover." Flintkote did not maintain or operate railroad equipment and had no facilities for doing so. It relied upon the railroad to maintain the cars in a safe condition. Its spur track was useless without the railroad's main line. In determining whether railcars in use on the spur track of a private employer were "in use" on the defendant railroad's line, the court looked to federal

decisions for guidance. Relying in particular on the reasoning in a factually similar case, *Monongahela Ry. Co. v. Black*, 235 F.2d 406 (4th Cir. 1956), the court found that the spur track was merely an extension of the railroad's operating line, promoting business for the railroad, and the court held that the equipment was in use on the defendant's line at the time the injury occurred. *Jenkins*, 5 Ill. App. 954, 284 N.E.2d 392.

In *Monongahela*, the plaintiff, an employee of the defendant railroad, was hit by a moving freight car on the sidetrack at the Arkwright coal mine. The coal company did not own any rolling stock or engines. It was not equipped to inspect or repair freight cars. It was a customer whose sole connection with the railroad was loading its cars. The railroad had claimed that it was not liable under the Act because its car was not "in use on its line." The court reasoned that the placing of cars on the sidetrack for loading was part of the interstate movement of coal over the railroad's system and that the sidetrack on the property of this private corporation existed "solely for the purpose of promoting commerce" on the railroad's line and was utterly valueless without the railroad. *Monongahela*, 235 F.2d at 407. The court held that since the car in question was being used as a part of the railroad's business in interstate commerce, the Safety Appliance Act applied. *Monongahela*, 235 F.2d at 407.

The reasoning of *Jenkins* and *Monongahela* is equally applicable in this case. Rusty Jones, an ADM employee, was killed while working with Illinois Central's railcars. Illinois Central delivered the cars to sidetracks on ADM property. Once the cars were placed on ADM's sidetrack, Illinois Central was required to do a "walk around" inspection to search for missing safety appliances. ADM employees then unloaded the grain from the cars onto river barges. Incident to the unloading process, the employees had to move the cars to the unloading pit. ADM had a switch engine that was only used to move Illinois Central's cars to and from the unloading pit, and it operated only on the sidetrack. ADM is not a railroad company and does not operate an independent railroad system. The ADM facility did not and was not equipped to make repairs to railcars. ADM relied upon Illinois Central to maintain its cars and to deliver them in a safe condition for unloading.

Illinois Central was the only rail carrier that made deliveries to this ADM facility. Illinois Central placed its cars on ADM's sidetrack for unloading purposes. The sidetrack, which connected to Illinois Central's track, was used exclusively for receiving Illinois Central cars. It was not connected with any other railroad's tracks. The track had no purposes other than to permit a more convenient method of

unloading Illinois Central's car and to promote commerce on Illinois Central's rail line. In our view, the sidetrack, as used, was an extension of Illinois Central's operating line and a necessary part of the movement of freight over Illinois Central's railway system. See *Jenkins*, 5 Ill. App. 3d at 962-63, 284 N.E.2d at 399-400; *Monongahela*, 235 F.2d at 407.

In support of its argument that its car was not in use on its line, Illinois Central relies upon *Paul v. Duluth, Missabe, & Iron Range Ry. Co.*, 96 F. Supp. 578, 579 (D. Minn. 1950). We find this case factually distinguishable. In *Paul*, the defendant railroad delivered its cars to a quarry company and that company used the cars in its quarry operations for an extended period of time. The quarry company had its own tracks, engines, and switch crew, which was used to move the cars as part of its quarry operations. See *Paul*, 96 F. Supp. at 579. In that case, the defendant railroad was, in essence, delivering its cars to another private railroad system, which then employed the cars for its own quarry operations.

The federal Safety Appliance Act covers a broad protected class, including railroad employees, passengers, and travelers at railroad crossings. See *Boyer*, 38 Ill. 2d at 37, 230 N.E.2d at 178. In our view, Rusty Jones was within the class of persons protected by the Safety Appliance Act. Therefore, we find no error in the trial court's decision to deny Illinois Central's motion for summary judgment and to allow plaintiff to proceed with his cause of action premised on a violation of the Safety Appliance Act.

### C. Jury Instructions—When is Railroad Equipment "In Use On the Railroad's Line"?

Illinois Central also argues that the trial judge incorrectly instructed the jury regarding when a car is "in use" on the railroad's line. Illinois Central argues that because the railroad car was on property owned by ADM, it was not in use on Illinois Central's line.

The two contested instructions follow:

"Use of a car on a railroad's line, for purposes of the Safety Appliance Act, includes instances where the defendant delivers a car that is in violation of the Safety Appliance Act to a nonrailroad customer on that customer's track for the purpose of loading and unloading the car." Plaintiff's Instruction No. 26.

"A customer of a railroad is considered a nonrailroad customer if the customer is not equipped to inspect and repair freight cars, nor did the railroad expect it to do so." Plaintiff's Instruction No. 27.

Before addressing the issue, we note that defendant offered a non-pattern instruction that was also given. That instruction stated:

"The Safety Appliance Act has no application to cars not in use

on the railroad's line. If you find from the evidence in this case that the car in question was not actually in use on Illinois Central's line but had been removed from its line, then the Safety Appliance Act does not have any application to this case, and plaintiff cannot recover under this Act." Defendant's Instruction No. 7.

■ In Illinois, parties have the right to have the jury instructed on the issues presented, the principles of law to be applied, and the necessary facts to be proved to support its verdict. See *Fetzer v. Wood,* 211 Ill. App. 3d 70, 74-75, 569 N.E.2d 1237, 1240 (1991). The decision to give or deny an instruction is within the trial court's discretion. The standard for determining an abuse of discretion is whether, taken as a whole, the instructions are sufficiently clear so as not to mislead and whether they fairly and correctly state the law. See *Fetzer,* 211 Ill. App. 3d at 75, 569 N.E.2d at 1240.

■ The contested instructions are not Illinois pattern instructions. There are situations where pattern instructions are inadequate and additional instruction is appropriate. See *Balestri v. Terminal Freight Cooperative Ass'n,* 76 Ill. 2d 451, 394 N.E.2d 391 (1979). In those situations, a nonpattern instruction is permissible under Illinois Supreme Court Rule 239(a) (177 Ill. 2d R. 239(a)) if it is simple, brief, impartial, and nonargumentative. Where a unique factual situation or point of law is presented, a nonpattern instruction may be given if it is accurate and will have no improper effect on the jury. See *Gordon v. Chicago Transit Authority,* 128 Ill. App. 3d 493, 501, 470 N.E.2d 1163, 1169 (1984).

■ Illinois pattern instructions do not include instructions defining the terms "in use on defendant's line" or "nonrailroad customer." Consequently, Rule 239(a) is not a bar to any of the contested instructions. Instruction No. 26 provided an accurate statement of law. See *Jenkins,* 5 Ill. App. 3d at 962-63, 284 N.E.2d at 399-400; *Monongahela,* 235 F.2d at 407. Instruction No. 7 stated the same proposition in the negative. Instruction No. 27 provided a definition of "nonrailroad customer." Were these definitional instructions necessary? We defer to the highly experienced trial judge, who was in a better position to assess the need for them. A trial court may properly give supplementary instructions to the jury to prevent confusion or to clarify an issue. See *Lebrecht v. Tuli,* 130 Ill. App. 3d 457, 489, 473 N.E.2d 1322, 1344 (1985). In future cases where a definitional instruction of the phrase "in use on a railroad's line" is deemed necessary, we would encourage the trial court and the litigants to prepare a single instruction that sets forth the concept accurately and succinctly. The instructions in this case, when considered as a whole, present a correct statement of the law and are not misleading. We find no merit in defendant's claim

of prejudice. Since the jury was adequately instructed, we find no abuse of discretion.

### D. Contributory Negligence and Assumption of the Risk

Illinois Central argues that the trial court erred in refusing to permit it to present evidence of plaintiff's contributory negligence, comparative fault, and assumption of the risk as affirmative defenses. Illinois Central argues that section 2—1116 of the Code of Civil Procedure (735 ILCS 5/2—1116 (West 1992)) allows a jury to consider comparative fault in both strict liability and negligence actions.

We disagree. Initially, we note that plaintiff's complaint does not sound in negligence or in product liability based on strict tort liability. The action is one to enforce absolute liability. See *Jenkins*, 5 Ill. App. 3d at 960, 284 N.E.2d at 399. Therefore, section 2—1116 does not apply. The Safety Appliance Act imposes an extraordinary duty on railroads to provide for the public safety of those who are at risk from defective appliances. The defenses of contributory negligence and assumption of the risk would permit a railroad to avoid its duty to those for whom the statute was enacted to benefit. See *Boyer*, 38 Ill. 2d at 35-36, 230 N.E.2d at 176. This reasoning has been applied by our courts in interpreting other safety and penal statutes. For example, in *Simmons v. Union Electric Co.*, 104 Ill. 2d 444, 473 N.E.2d 946 (1984), the Illinois Supreme Court held that comparative fault does not apply to actions maintained under the Illinois Structural Work Act, a safety statute, reasoning that the legislature intended to remove the fault of the worker as a defense, so as to provide complete protection for workers. Similarly, Congress imposed an absolute duty on the railroad carriers to protect a certain class of persons against their own inability to protect themselves from risks posed by malfunctioning couplers. See *Boyer*, 38 Ill. 2d at 35-36, 230 N.E.2d at 176.

Absolute-liability statutes are intended to protect persons against their own inability to protect themselves from specific risks. See *Simmons*, 104 Ill. 2d at 458-59, 473 N.E.2d at 953-54. To permit evidence that the injured party assumed the risk or was contributorily negligent would undermine the very purpose of these statutes. The Safety Appliance Act imposes an absolute duty, the violation of which is itself an actionable wrong that is not dependent on negligence. See *O'Donnell v. Elgin, Joliet & Eastern Ry. Co.*, 338 U.S. at 390, 94 L. Ed. at 192, 70 S. Ct. at 204. Allowing the defenses of comparative fault or assumption of the risk would be inconsistent with the intent of Congress. In our judgment, assumption of the risk and comparative negligence defenses are not applicable in an action premised upon a violation of the Safety Appliance Act. The trial court did not abuse its discretion in striking these defenses.

## II. OTHER TRIAL ERRORS

### A. The Failure to Excuse a Juror for Cause

Illinois Central also argues that the trial court abused its discretion in failing to excuse a potential juror, Wanda Wells, for cause. During *voir dire*, Ms. Wells stated that she had been involved in an automobile accident with an Illinois Central train approximately 15 years earlier. Ms. Wells stated that she was injured in the accident and that her claim had been settled to her satisfaction. She stated that though she sometimes experienced problems due to the injuries, she was "happy to be alive." She told the attorneys that she could separate her experience from the pending case and that she was not biased against Illinois Central. She stated that she could find against plaintiff if plaintiff did not prove its case.

Counsel for Illinois Central moved to excuse Ms. Wells for cause. The trial court denied the motion. Thereafter, Illinois Central did not use a peremptory challenge to strike her. Ms. Wells did serve as a juror in the case. Illinois Central argues that Ms. Wells had an adversarial relationship with Illinois Central which prevented her from being fair and impartial.

■ The burden of showing that a juror possesses a disqualifying state of mind is on the party challenging the juror. See *People v. Cole*, 54 Ill. 2d 401, 413, 298 N.E.2d 705, 712 (1973). A person is not competent to sit as a juror if his state of mind is such that with him as a juror a party will not receive a fair and impartial trial. See *Cole*, 54 Ill. 2d at 413, 298 N.E.2d at 712. The determination of impartiality is not purely objective. The trial court may consider a juror's statements as evidence of his state of mind. See *Roach v. Springfield Clinic*, 157 Ill. 2d 29, 48, 623 N.E.2d 246, 254 (1993). The determination of whether a prospective juror is capable of giving the parties a fair and impartial trial rests in the sound discretion of the trial judge, whose determination should not be set aside unless it is against the manifest weight of the evidence. See *Cole*, 54 Ill. 2d at 414, 298 N.E.2d at 712.

■ We recognize that there are times when the relationship of a prospective juror to a party or case can be so close that fairness requires the juror be disqualified. See *Marcin v. Kipfer*, 117 Ill. App. 3d 1065, 454 N.E.2d 370 (1983). This is not one of those cases. Counsel for both parties carefully questioned Ms. Wells. She repeatedly stated that she could be fair and impartial. She demonstrated no bias against Illinois Central in her responses. Great weight should be given to a prospective juror's statement under oath that she can lay aside matters that might indicate bias and that she can render a verdict based upon the evidence. See *Marcin*, 117 Ill. App. 3d 1065, 454 N.E.2d 370.

We note that Ms. Wells' accident occurred and was amicably settled more than a decade before the pending action. There was no ongoing relationship between the juror and defendant. See *Roach*, 157 Ill. 2d at 48, 623 N.E.2d at 254. Further, the factual aspects of the two claims are quite different. Ms. Wells was involved in an auto-train collision. The pending case alleged a defect in train equipment. Ms. Wells did not hesitate or equivocate at any time during *voir dire* when asked whether she could be fair and impartial. She stated that she could be fair to both parties and that her previous experience had nothing to do with this case. The trial court apparently found her to be credible when she made these statements. We find no abuse of discretion in refusing to strike Ms. Wells for cause.

## B. Evidence Regarding Decedent's Spouse's Multiple Sclerosis

Illinois Central contends that the trial court erred when it permitted Dr. Mellies to testify about the health of the decedent's spouse, Mary Jones. Dr. Mellies, a neurologist, testified that he began treating Mary Jones for a multiple sclerosis condition in 1992. He explained what multiple sclerosis is and how it affects the body. He described the clinical course of the disease in Mary Jones and explained the types of treatments he prescribed for her. He also recounted the rapid deterioration in her condition after her husband's death.

Illinois Central argues that the admission of Dr. Mellies' testimony violated the long-standing rule that the poverty, helplessness, and dependence of relatives of the deceased are immaterial to the damages issue in a wrongful death case. In support of this proposition, Illinois Central relies on *Freehill v. De Witt County Service Co.*, 125 Ill. App. 2d 306, 320, 261 N.E.2d 52, 58 (1970), which held that the wealth, health, poverty, or helplessness of the beneficiary cannot be considered in determining the damages for wrongful death. Illinois Central also argues that the testimony of Dr. Mellies went beyond the limited inquiry permitted in *Stringham v. United Parcel Service, Inc.*, 181 Ill. App. 3d 312, 536 N.E.2d 1292 (1989).

As noted in *Stringham*, recent supreme court and appellate decisions have "diminished the vitality" of that portion of the *Freehill* holding which disallowed evidence of future health or helplessness on the issue of loss of society. *Stringham*, 181 Ill. App. 3d at 316, 536 N.E.2d at 1294. In *Stringham*, the trial court had permitted a physician to testify about the effect that Down's Syndrome would have on the surviving child's educability, her ability to care for herself over the course of her childhood and adulthood, and the projected progression of her visual impairment as she grew older. *Stringham*, 181 Ill. App. 3d at 314-15, 536 N.E.2d at 1293. The court held that a limited in-

quiry into Down's Syndrome suffered by a surviving child of the decedent was permissible, reasoning that the physician's testimony was relevant to show the child's loss of her father's guidance, attention, and instruction and attendant pecuniary loss. *Stringham*, 181 Ill. App. 3d at 315, 536 N.E.2d at 1293.

The purpose of the Wrongful Death Act (740 ILCS 180/0.01 *et seq.* (West 1996)) is to compensate the surviving spouse and next of kin for losses sustained due to the death. It is intended to provide the surviving spouse with benefits he or she would have received from the continued life of the decedent. The value of a human life consists of many elements, and an individual member of a family has value to others as part of a functioning social and economic unit. See *Chladek v. Albon*, 161 Ill. App. 3d 884, 889, 515 N.E.2d 191, 194 (1987). It includes the value of society, companionship, and conjugal relations that the decedent provided to the surviving spouse. See *Elliott v. Willis*, 92 Ill. 2d 530, 540, 442 N.E.2d 163, 168 (1982). The evaluation of the loss cannot be made in a vacuum but, rather, must include an understanding of the relationships among all of the family members. See *Chladek*, 161 Ill. App. 3d at 889, 515 N.E.2d at 194.

The testimony of other family members, including Rusty's parents and his two daughters, showed that prior to his death Rusty Jones provided home health care to his wife, including giving her the injections prescribed to treat her multiple sclerosis. The testimony revealed that Rusty Jones had actively participated in the treatment of his wife's illness, assumed primary responsibility and provided care for the couple's children, and counseled the children regarding their mother's illness. The evidence showed that, after Rusty Jones died, Mary Jones stopped taking her injections for some time. She did not have home health care assistance for a substantial period. She moved into a rented house and lived alone. Because she was unable to care for the couple's children, they went to live with other people. She had little contact with her children until approximately one month before her death.

In our judgment, Dr. Mellies' testimony provided an independent basis from which the jury could evaluate the benefits the family would have received from the continued life of the decedent. See *Chladek*, 161 Ill. App. 3d at 889, 515 N.E.2d at 194. His testimony was relevant to demonstrate the value of the decedent's companionship, support, and conjugal relations with his wife (see *Elliott*, 92 Ill. 2d at 540, 442 N.E.2d at 168), and the children's loss of their father's guidance, attention, and instruction (see *Stringham*, 181 Ill. App. 3d at 315, 536 N.E.2d at 1294). We echo the admonition given in *Stringham* and *Chladek* that trial courts must be vigilant in limiting this type of

testimony so that it does not turn into a sideshow or a means of garnering sympathy from the jury. However, we find no error in the admission of this testimony in this case.

## C. The Admissibility of Tim Schaal's Opinion Testimony and the ADM Safety Rules

■ Illinois Central argues that the trial court abused its discretion and committed reversible error in failing to allow it to question Tim Schaal, an ADM superintendent, regarding his opinion of whether Rusty Jones violated certain ADM plant safety rules. Illinois Central claims that this testimony would have been relevant to the issue of sole proximate cause and contributory negligence by the decedent.

During trial, Illinois Central questioned Mr. Schaal about various plant safety rules and regulations for ADM employees. Through Schaal's testimony, Illinois Central established that several safety rules were in effect at the ADM facility. Schaal testified, without objection, that he investigated the accident and concluded that Rusty Jones violated a safety rule against "being in between two moving cars or moving cars less than thirty feet apart."

Through Mr. Schaal's testimony, Illinois Central also established that there were plant rules stating that workers should not attempt to adjust the coupling unit on cars while they are moving and that workers should not use defective equipment. Illinois Central then asked Mr. Schaal whether, in his opinion, Rusty Jones violated those rules. Plaintiff objected and the court sustained the objection. The court reasoned that, once the jury had been presented with the rule and had heard about Rusty Jones's conduct, any violation would be self-evident and the jury would need no help in determining whether the conduct violated a specific rule.

The trial court's judgment in regard to the admission or exclusion of evidence will not be disturbed absent a clear abuse of discretion. See *Hopkinson v. Chicago Transit Authority*, 211 Ill. App. 3d 825, 844, 570 N.E.2d 716, 727 (1991). A lay witness may offer an opinion if it is helpful to a clear understanding of his testimony or the determination of a fact in issue. See *Hopkinson*, 211 Ill. App. 3d at 846, 570 N.E.2d at 730. In this case, we agree with the trial court's determination that Mr. Schaal's opinion was neither helpful nor necessary. The safety rules in question are simply worded and easy to understand. This is not a case where the rules are complex or the information is beyond the understanding of jurors. The jury could easily understand the rules and determine whether the decedent violated any of them.

■ Illinois Central also contends that the trial court abused its discretion in redacting certain portions of the ADM safety rules from

defense exhibit 7 before permitting that exhibit to go to the jury during deliberations. The trial court ordered that Rule 11 and Rule 14 be redacted from defense exhibit 7. Rule 11 required employees to notify a supervisor of any railcar defects. The evidence demonstrated that Rusty Jones was the supervisor. The trial court agreed with plaintiff's position that Rusty Jones could not have violated Rule 11 because he was the person to whom the employees were required to report. Rule 14 required that if an employee must adjust a coupling unit on a car, the employee must "stop the car to do so." In this case, there was no evidence that Rusty Jones attempted to adjust a coupler on a moving car. The trial court found that Rule 11 and Rule 14 were not applicable to the facts of the case. Based upon this record, we cannot say that the trial court abused its discretion in redacting these rules before permitting the jury to review the exhibit during deliberations. A trial court has great discretion in deciding which exhibits may be taken to the jury room. See *Fultz v. Peart*, 144 Ill. App. 3d 364, 379, 494 N.E.2d 212, 223 (1986). We believe that the trial court acted well within its discretion. Further, we note that neither the testimony nor the rules were admissible as evidence of the decedent's comparative negligence. See *Simmons*, 104 Ill. 2d at 460, 473 N.E.2d at 954. The trial court could have concluded that this testimony was offered, under the guise of a sole proximate cause theory, as a way of getting evidence of comparative negligence in through the back door. See *Baker v. CSX Transportation, Inc.*, 221 Ill. App. 3d 121, 133-34, 581 N.E.2d 770, 779 (1991). We find no abuse of discretion in excluding this evidence.

### D. Prejudice Created by Plaintiff's Opening Statement and Closing Argument

Illinois Central argues that the trial court erred in refusing to grant a mistrial due to remarks made by plaintiff's counsel during opening statement and closing argument. Prior to trial, Illinois Central filed a motion *in limine* seeking to prevent the introduction of evidence that Leslie Jones, the 12-year-old daughter of Rusty Jones, began drinking and attempted suicide shortly after her father's death. During a pretrial conference, the trial court ordered that this evidence not be referenced in opening statements, but the court reserved ruling on its admissibility.

During his opening statement, plaintiff's counsel stated: "Leslie, at twelve years old, started drinking. In fact, Dr. Mellies will tell you that it was reported to him in his medical history that she tried to commit suicide shortly after her father's death." Illinois Central immediately requested a sidebar. During a conference in the court's chambers, Illinois Central objected to the statements about alcohol

and suicide, argued that plaintiff had violated the court's order *in limine*, and requested that the court instruct the jury to disregard the statements and instruct that those were not claims before the court. Illinois Central also requested a mistrial. Plaintiff's counsel indicated that this was not his memory of the pretrial conference, and he said he had "forgotten" the ruling. He argued that the evidence was admissible as evidence of the daughter's loss of her father's society.

The trial court found that counsel's statement violated the court's order. The court ruled that the evidence regarding the daughter's drinking and suicide attempt amounted to a claim for physical harm to the daughter, not evidence of loss of her father's society, and was not admissible. The court denied the motion for a mistrial. The court then instructed the jury to disregard the statements about the daughter's alcoholism and her suicide attempt. The court instructed the jurors that those "are not claims before the court and aren't to be considered by the jury."

■ Violation of a motion *in limine* is not *per se* reversible error. Improper comments generally do not constitute reversible error unless the party has been substantially prejudiced. See *People v. Baptist*, 76 Ill. 2d 19, 389 N.E.2d 1200 (1979). Although the prejudicial effect of an improper argument cannot be erased from the minds of jurors by an admonishment from the court, the act of properly sustaining an objection and instructing the jury to disregard such argument has usually been viewed as sufficient to cure any prejudice. See *Hartman v. Pittsburgh Corning Corp.*, 261 Ill. App. 3d 706, 729, 634 N.E.2d 1133, 1148 (1994). Ruling on the prejudicial effects of counsel's improper comments during opening statement is a matter within the discretion of the trial court. Because the trial court is in a superior position to evaluate the effect of improper comments, a reviewing court will not substitute its own judgment absent a clear abuse of discretion. See *Hartman*, 261 Ill. App. 3d at 728, 634 N.E.2d at 1148.

■ Whether intentional or inadvertent, plaintiff's counsel violated the court's *in limine* order when he referenced during opening statement the alcohol abuse and suicide attempt. In order for the violation of an *in limine* order to serve as the basis for a new trial, the party seeking the exclusion of the evidence must have been deprived of a fair trial. See *Kwon v. M.T.D. Products, Inc.*, 285 Ill. App. 3d 192, 198, 673 N.E.2d 408, 412 (1996). Counsel's comment, a two-line statement, occurred near the beginning of a six-day trial. There was no further reference to this evidence during the trial. Further, the trial court could have reasonably found that Leslie Jones's own testimony diffused the effect of any prejudice from counsel's opening remarks. Leslie Jones admitted that she got involved with "the wrong crowd" af-

ter her father's death, but she stated all of that was behind her. She told the jury that she was living with her grandmother, was on the honor roll at her high school, and was making plans to go to college. While we do not condone counsel's violation of the *in limine* order, we do not think that counsel's remark, a brief reference in the context of a lengthy trial, deprived defendant of a fair trial. The court's admonition to the jury was sufficient to cure any prejudice. The trial court did not abuse its discretion in denying defendant's motion for mistrial. Given our disposition, we need not determine the admissibility of the disputed evidence.

Illinois Central also contends that the trial court should have declared a mistrial because comments made by plaintiff's counsel in closing argument were so prejudicial that it did not receive a fair trial. Illinois Central argues that counsel's comments were not permissible inferences based upon the evidence and served only to inflame the jury.

During rebuttal, plaintiff's counsel argued as follows:

"What's really scary in this case is that, apparently, that car is still running out there with a bad toggle on it waiting to kill somebody else someplace."

The court sustained Illinois Central's objection and instructed the jury to disregard the comment. Later in rebuttal, plaintiff's counsel stated:

"What I find extremely interesting from the testimony since Rusty Jones died, there's never been another one come in there. They cleaned up their act."

Illinois Central objected on the grounds that this comment improperly referred to subsequent remedial measures, and Illinois Central requested a mistrial. The court sustained Illinois Central's objection but denied its motion for mistrial.

Attorneys are permitted wide latitude in closing argument. See *Lauman v. Vandalia Bus Lines, Inc.*, 288 Ill. App. 3d 1063, 1071, 681 N.E.2d 1055, 1061 (1997). Comments on the evidence during closing argument are proper if proven by direct evidence or if reasonably inferable from the facts. See *Kwon*, 285 Ill. App. 3d at 199, 673 N.E.2d at 413. A judgment will not be reversed unless the challenged remarks were of such character as to prevent a party from receiving a fair trial. See *Lauman*, 288 Ill. App. 3d at 1071, 681 N.E.2d at 1061. In determining whether a party has been denied a fair trial due to improper closing argument, a reviewing court gives considerable deference to the trial court, which is in a superior position to assess the effect of counsel's statements. See *Lauman*, 288 Ill. App. 3d at 1071, 681 N.E.2d at 1061. Improper closing argument will not warrant reversal without a showing of substantial prejudice. See *Lauman*, 288 Ill. App. 3d at 1069, 681 N.E.2d at 1061.

During the trial, railroad employees and plaintiff's expert testified that the toggle was broken. Illinois Central elicited testimony from its own witness, David Williams, a freight agent for Illinois Central, who stated that there were no records demonstrating that any repairs had been made to the railcar or the toggle after the accident. Thus, it would not be improper for either party to propose reasonable inferences from the fact that there was no repair record. In this case, the trial court ruled that counsel's comment that the broken toggle is "waiting to kill somebody else someplace" was improper argument, and the trial court sustained the objection and instructed the jury to disregard the comment. The court also ruled that counsel's second comment constituted an improper reference to subsequent remedial measures, but the court determined that an instruction was sufficient to cure any prejudice.

We do not believe that the comments by plaintiff's counsel in closing argument prevented defendant from receiving a fair trial. The record demonstrates that after each comment was made, the trial court immediately sustained defendant's objections and instructed the jury to disregard the comment. Prior to jury selection, the court instructed the potential jurors that remarks made by the attorneys in opening statements and closing arguments are not evidence. During final instructions, the trial court instructed jurors that remarks made by the attorneys in opening statements and closing arguments are not evidence. Given the nature of the case and the evidence, the verdict and award do not demonstrate any undue influence or prejudice. The plaintiff presented a submissible case that, if accepted by the jury, would lead to a plaintiff's verdict. See *Lauman*, 288 Ill. App. 3d at 1069, 681 N.E.2d at 1061. Further, though plaintiff's counsel suggested that $3.41 million might be an appropriate amount for damages for the loss of a husband and father, the jury returned an award for approximately half that amount. There is no evidence of a runaway verdict. See *Decker v. Domino's Pizza, Inc.*, 268 Ill. App. 3d 521, 531-32, 644 N.E.2d 515, 522 (1994). The trial court was in the best position to determine the effect of these comments and whether they were so prejudicial as to deny to defendant a fair trial. After reviewing the record, we do not find that defendant was substantially prejudiced or was denied a fair trial as a result of these comments. In our judgment, the court's actions were sufficient to cure any prejudice. The court did not abuse its discretion in denying defendant's motion for mistrial.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

HOPKINS, J., concurs.

JUSTICE CHAPMAN, dissenting:

I concur in the majority's ruling on all the issues it discusses except for its ruling on the violation of the court's *in limine* order, and as to that issue only, I would reverse and remand for a new trial. Therefore, I dissent.

On the first day of trial the court ordered plaintiff's counsel to refrain from mentioning in his opening statement the drinking activities and the suicide attempt of the decedent's 12-year-old daughter. On the second day of trial, during his opening statement, plaintiff's counsel told the jury:

> "Leslie, at twelve years old, started drinking. In fact, Dr. Mellinese [*sic*] will tell you that it was reported to him in his medical history that she tried to commit suicide shortly after her father's death."

There could not be a more clear violation of a more direct order. Whether the violation was deliberate and intentional or merely inadvertent has a bearing on the sanction a judge might impose on the lawyer, but we are not concerned in this appeal with the effect of the violation on the judge. We are concerned with its effect on the jury in this case, and I am concerned with its effect on the conduct of counsel in future cases.

The majority concludes that the brevity of the statement, the fact that there was no reference to such evidence during the trial, and Leslie Jones's own testimony could have diffused the prejudicial effect of the statements. I cannot agree.

In my judgment, the fact that the violation was brief is entitled to little consideration. Brevity should not be equated with weakness:

> "Give me liberty, or give me death."
> "Remember the Alamo."
> "Yesterday, December 7, 1941—a date which will live in infamy—"

Each of these statements is shorter than the violation, but each sent this nation into war.

The majority's second point, that there was no further reference to the evidence during the trial, is also unpersuasive. It is because the trial court had ruled that this evidence was not admissible that the *in limine* order was entered and that no further reference to it was made.

The majority's third point, that Leslie's own testimony could have diffused any prejudice, implies a recognition that some corrective mea-

sure was required. The proper corrective measure was the declaration of a mistrial.

I agree with the majority that the trial judge is entitled to discretion, but in my judgment, he abused his discretion when he denied defendant's motion for a mistrial in this case.

Opinions are not written just to exhibit the reasons for appellate court's decisions; they also serve as guides for the future conduct of trials. In my judgment, the majority's ruling on this issue sends absolutely the wrong message to both trial counsel and trial courts. To trial counsel it says, "You are free to violate court orders." To trial courts it says, "You are free to overlook the violations of your orders." I disagree with both these propositions, and I, therefore, respectfully dissent.